UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 11 |
| PARKLAND PROPERTIES, LLC, et al., | ) | Bankruptcy No. 13 B 22702 |
| | ) | Jointly Administered |
| | ) | Judge Donald R. Cassling |
| Debtors. | ) | |

**MEMORANDUM OPINION**

**I.    INTRODUCTION**

This matter is before the Court on the motion of Parkland II, LLC, the Reorganized Debtor

("Parkland II"), to enforce the order entered on October 13, 2015 confirming and modifying, in

part, Parkland II's Sixth Modified Plan of Reorganization (the "Confirmation Order") against

Bridgeview Bank Group ("Bridgeview") and to award damages to Parkland II.  For the following

reasons, the Court denies the motion.

**II.    JURISDICTION**

The Court first concludes that it has jurisdiction to hear this motion, despite the long

passage of time since confirmation of Parkland II's plan of reorganization.   A bankruptcy court

retains post-confirmation jurisdiction to protect the confirmation order, to prevent interference

with the execution of the plan, and to aid in the plan's operation. *In re Kmart Corp.*, 359 B.R. 189,

195 (Bankr. N.D. Ill. 2005); *see also In re Am. Consol. Transp. Cos.*, 470 B.R. 478, 494 (Bankr.

N.D. Ill. 2012) (stating that jurisdiction is retained when the debtor's plan provides for retention

of jurisdiction and that retention is necessary for implementation of the plan and to clarify

ambiguities in the plan); *Levine v. Telco Sys., Inc. (In re World Access, Inc.)*, 324 B.R. 662, 680

(Bankr. N.D. Ill. 2005) (same).  Article XII of the plan specifically provides that the Court will

retain jurisdiction over all matters, including any necessary interpretation or enforcement of the

terms and conditions of the plan. (Dkt. No. 506, Art. XII.) Because resolution of this motion

requires interpretation of the plan and Confirmation Order, the Court has jurisdiction to hear this

motion.

## III.    BACKGROUND

On June 18, 2013, Parkland II filed a voluntary Chapter 11 bankruptcy petition

(13 B 25121). Between May 31, 2013 and July 2, 2013, five related entities of Parkland II also

filed voluntary Chapter 11 petitions: Parkland Properties, LLC (No. 13 B 22702); Parkland III,

LLC (No. 13 B 25125); Parkland IV, LLC (No. 13 B 26018); Parkland V, LLC (No. 13 B 27098);

and Parkland VI, LLC (No. 13 B 26811) (collectively, the "Debtors"). On August 26, 2013, the

Court entered an order directing joint administration of these related Chapter 11 cases and

requiring all documents in the cases to be filed under the caption of "Parkland Properties, LLC, et

al., Debtor, Case No. 13-22702." (Dkt. No. 43.)

### The Bridgeview Judgments

Before these bankruptcies, Bridgeview had filed separate lawsuits against several of the

Debtors in the Illinois Circuit Court of Cook County (the "State Court"). In each of these suits,

Bridgeview also named Glenn M. Brettner and James D. Brettner (collectively, the "Brettners"),

the principals of the Debtors, as defendants. Bridgeview received a judgment in its favor in every

suit. On May 7, 2013, the State Court entered the first judgment against Parkland V, LLC and the

Brettners jointly and severally, in the amount of $717,804.41. (Bridgeview Resp. Ex. No. 1.) On

May 10, 2013, Bridgeview recorded a memorandum of judgment with the Cook County Recorder

of Deeds—creating a judgment lien against property located at 1508 North Artesian, Chicago,

Illinois (the "Artesian Property"). (*Id.* at Ex. No. 2.)

On May 10, 2013, the State Court entered a second judgment against Parkland II and the

Brettners, jointly and severally, in the amount of $44,466.27. (*Id.* at Ex. No. 3.) On May 23, 2013, Bridgeview recorded a memorandum of judgment with the Cook County Recorder of Deeds thereby creating a second judgment lien against the Artesian Property. (*Id.* at Ex. No. 4.)

On May 10, 2013, the State Court entered the third judgment against Parkland III, LLC and the Brettners, jointly and severally, in the amount of $107,254.22. (*Id.* at Ex. No. 5.) On May 30, 2013, Bridgeview recorded a memorandum of judgment with the Cook County Recorder of Deeds thereby creating another judgment lien against the Artesian Property. (*Id.* at Ex. No. 6.)

On May 10, 2013, the State Court entered the fourth judgment against Parkland VI, LLC and the Brettners, jointly and severally, in the amount of $599,391.46. (*Id.* at Ex. No. 7.) On June 14, 2013, Bridgeview recorded a memorandum of judgment with the Cook County Recorder of Deeds thereby creating a fourth judgment lien against the Artesian Property. (*Id.* at Ex No. 8.)

### The Countrywide/BOA Loans

Roughly a decade before the State Court litigation between Bridgeview and the Debtors, the Brettners had executed a note in the amount of $253,000.00 in favor of Countrywide Home Loans, Inc ("Countrywide") on May 16, 2003. (Bridgeview Resp. at p. 4.) That note was secured by a mortgage against the Artesian Property. The mortgage was recorded with the Cook County Recorder of Deeds on May 16, 2003 (the "Countrywide Mortgage"). (*Id.*) Bank of America ("BOA"), as successor in interest to Countrywide, released the Countrywide Mortgage on May 16, 2013 through a mortgage release filed with the Cook County Recorder of Deeds. (*Id.*) On May 6, 2013, the Brettners executed a new note in the amount of $216,400.00, secured by a mortgage against the Artesian Property and held by BOA (the "BOA Mortgage"). (*Id.*) BOA recorded the BOA Mortgage with the Cook County Recorder of Deeds on May 30, 2013, which occurred two weeks after Bridgeview recorded its judgment liens against the Artesian Property. (*Id.* at pp. 4-5.)

3

**The Bridgeview Foreclosure Action**

On October 18, 2013, Bridgeview filed a foreclosure action in the State Court on the Artesian Property against the Brettners and BOA (the "Foreclosure Action"). (*Id.* at p. 5.) BOA challenged the priority of Bridgeview's liens in the Foreclosure Action. (*Id.*) Bridgeview filed a motion for summary judgment as to lien priority. (*Id.*) On March 26, 2015, the State Court granted Bridgeview's motion for summary judgment for Bridgeview and ruled that Bridgeview's judgment liens against the Artesian Property had priority over BOA's Mortgage lien. (*Id.*) On April 24, 2015, BOA moved to reconsider that summary judgment order. (*Id.*) BOA's motion was denied on March 29, 2018. (*Id.* at p. 8.)

**The Brettners' Individual Bankruptcies and Avoidance Actions Against Bridgeview**

On November 5, 2013 and July 25, 2014, the Brettners each filed voluntary Chapter 7 bankruptcy petitions (13 B 43328 and 14 B 27382). On February 21, 2014 and August 18, 2014, the Court entered orders lifting the automatic stay in both bankruptcy cases to permit Bridgeview to continue with the Foreclose Action. (Bridgeview Resp. Group Ex. No. 9.) On April 7, 2015, the Debtors filed an adversary proceeding against Bridgeview to recover the Artesian Property (15 A 00238). In the complaint, the Debtors sought to avoid the transfer of the Artesian Property from Parkland II to the Brettners as fraudulent and Bridgeview's judgment lien against the Artesian Property as a preferential transfer. (15 A 00238, Dkt. No. 1.)

The Debtors alleged in the complaint that Parkland II originally owned the Artesian Property. (*Id.* at ¶ 14.) According to the Debtors, to effectuate a 2013 financing transaction, BOA required Parkland II to deed the Artesian Property to the Brettners individually. (*Id.* at ¶¶ 15 & 16.) But BOA also gave assurances to the Debtors that they could transfer the Artesian Property back to Parkland II after the closing. (*Id.* at ¶ 15.) On June 1, 2015, the Court entered an agreed

judgment providing, among other things, that the Debtors could avoid the transfer and recover ownership of the Artesian Property on behalf of their bankruptcy estates. (*Id.* at Dkt. No. 19.) The agreed judgment also provided that Bridgeview's liens on the Artesian Property would remain unaffected by transferring the Artesian Property to the Debtors' bankruptcy estates. (*Id.*) As a result of the agreed judgment, Parkland II recovered title to the Artesian Property, which became property of its bankruptcy estate under 11 U.S.C. § 541(a)(3). As another result of that judgment, Bridgeview's Foreclosure Action in the Parkland II's bankruptcy case was automatically stayed under 11 U.S.C. § 362. Bridgeview and Parkland II ultimately resolved the adversary proceeding through a series of stipulations and agreed orders. (*Id.* at Dkt. Nos. 28 & 29.)

On August 17, 2015, Parkland II filed its Sixth Modified Plan of Reorganization (the "Sixth Modified Plan"). (Dkt. No. 506.) On September 25, 2015, Parkland II filed a notice of "Proposed Non-Material Modifications to the Debtors' Plan of Reorganization." (Dkt. No. 538.) With Bridgeview's agreement, § 3.07 of the Sixth Modified Plan was further modified as follows:

**CLASS VII CLAIM:** The Bridgeview Allowed Claim is also secured by a judgment lien on the property commonly known as 1508 Artesian, Chicago, Illinois (the "Artesian Property"). On the Effective Date, Debtor shall dismiss (or cause to be dismissed) with prejudice Adversary Proceeding No. 15-00238, captioned as *Parkland Properties, LLC v. Bridgeview Bank et al.*

On September 15, 2015, the Court entered the Stipulation for Relief from the Automatic Stay and Order Thereon (the "Lift Stay Order") [Docket No. 529], pursuant to which, among other things, the automatic stay was lifted pursuant to Section 362(d) of the Bankruptcy Code so that Bridgeview may exercise its rights and remedies under applicable law, including without limitation, foreclose its liens on, to, and against the Artesian Property (the "Foreclosure Sale"). **In the event Bridgeview is the successful bidder in the Foreclosure Sale, Bridgeview shall finance Debtor's purchase of the Artesian Property from Bridgeview on terms and conditions acceptable to Bridgeview in its sole discretion (which will not include disbursement of funds to Debtor/borrower by Bridgeview) pursuant to the following terms:**

**The principal amount of the loan on the Artesian Property shall be $333,000 (the "Artesian Property Loan"). Debtor shall pay Bridgeview $2,163.35 each month for fifty-nine (59) months with a balloon payment of $302,048.84 due**

**on the 60th month after the Effective Date.** This equates to a five (5) year mortgage amortized over 25 years with an interest rate of 6.0%. The Artesian Property Loan shall be documented using Bridgeview's standard loan documentation, as may be modified by Bridgeview in its sole discretion.

(13 B 25121, Dkt. No. 49) (emphasis added).

On October 6, 2015, Bridgeview filed a ballot, as holder of the Class VII claim, accepting Parkland II's plan subject to the Court's approval of the agreed modification. (Dkt. No. 546.) On October 13, 2015, the Court entered the Confirmation Order, which incorporated the agreed modification into Parkland II's Sixth Modified Plan (the Sixth Modified Plan, as further modified by the Confirmation Order, will be called the "Plan"). (13 B 25121, Dkt. No. 49.) The Confirmation Order included the modification to § 3.07 of the Plan described above.

### BOA's Motion to Vacate the Confirmation Order

On January 21, 2016, BOA moved to amend the Confirmation Order entered in the Parkland II case as well as the order confirming the plan in the Parkland VI, LLC case. (Dkt. No. 564.) In that motion, BOA stated that it had not received notice of the bankruptcy cases in general, and of the confirmation hearing in particular. (*Id.* at ¶ 1.) On March 1, 2016, Parkland II and Parkland VI, LLC moved to modify the Plan to eliminate the determination of the lien priority between Bridgeview and BOA made in the Confirmation Order. (Dkt. No. 578.) On March 29, 2016, the Court entered an order which modified the Plan for the sole purpose of allowing the State Court to determine the lien priority of Bridgeview's and BOA's liens on the Artesian Property. (Dkt. No. 593.) As discussed previously, the State Court granted summary judgment for Bridgeview, concluding that its lien rights were superior to those of BOA.

### The State Court Proceedings on Remand

On May 16, 2018, the Sheriff of Cook County conducted a public sale of the Artesian Property. Bridgeview provided notice of the sale to all interested parties and published notice of

6

the pending sale. (Bridgeview Resp. Group Ex. No. 10.)  Bridgeview's nominee, 1508 N. Artesian/Chicago LLC, successfully bid on the Artesian Property for $409,000.00. (*See* Parkland II Mot. Ex. B.)  On June 22, 2018, the State Court confirmed the Sheriff's sale. (*Id.* at Ex. C; Bridgeview Resp. Ex. No. 11.)  The State Court also issued an *in rem* deficiency judgment in Bridgeview's favor in the amount of $293,121.78 against the Artesian Property. (*Id.*)  Bridgeview served the order upon all interested parties, including the Brettners. (Bridgeview Resp. Ex. No. 12.)  On June 28, 2018, the Sheriff executed a Sheriff's Deed on the Artesian Property. (Bridgeview Resp. p. 9.)  As a result, Bridgeview's nominee, 1508 N. Artesian/Chicago LLC received fee simple title to the Artesian Property. (*Id.*)

### Bridgeview's Efforts to Comply With § 3.07 of the Plan and Parkland II's Response

On June 25, 2018, counsel for Bridgeview, Adam B. Rome ("Mr. Rome"), emailed counsel for the Debtors, Michael Ohlman ("Mr. Ohlman"), to inform him of the foreclosure sale of the Artesian Property to Bridgeview's nominee, and requested that Mr. Ohlman advise him on how Parkland II wished to proceed with respect to the Artesian Property. (*Id.* at Ex. No. 13.)  As part of that financing, Mr. Ohlman stated that Parkland II "will be entering into a modified mortgage" for the Artesian Property in Bridgeview's favor. (*Id.* at Ex. No. 14.)

After receiving that communication, Bridgeview began preparing loan documents to execute the agreement, consistent with the terms specified in § 3.07 of the Plan (the "Artesian Property Loan").  On July 11, 2018, Mr. Rome asked Mr. Ohlman to schedule a property inspection and to identify the name of the entity that would take title to the Artesian Property. (*Id.* at Ex No. 15.)  The next day, Mr. Ohlman informed Mr. Rome that he wanted to schedule the inspection of the Artesian Property for the next week. (*Id.* at Ex. No. 16.)  On July 17, 2018, Mr. Ohlman informed Mr. Rome of the name of the entity that would take title to the Artesian Property. (*Id.* at

Ex. No. 17.)

On July 19, 2018, Mr. Rome asked Mr. Ohlman to provide the tax identification number and organizational documents for the entity taking title to the Artesian Property. (*Id.* at Ex. No. 18.) On July 23, 2018, Glenn Brettner responded directly to Mr. Rome's request, emailing a banker at Bridgeview the requested tax identification information. (*Id.* at Ex. No. 19.) Later that day, Bridgeview's banker responded thanking Mr. Brettner and stating that Bridgeview wanted to close the Artesian Property Loan that week. (*Id.* at Ex. No. 20.) After this communication, Mr. Brettner stopped responding to Bridgeview's correspondence.

On July 25, 2018, Bridgeview asked Mr. Brettner whether he would be available to sign the loan documents on July 30 or July 31, 2018. (*Id.* at Ex. No. 21.) Mr. Brettner never responded to that email. On July 26, 2018, Bridgeview emailed Mr. Brettner the draft loan documents and again asked to schedule the closing on July 30, or July 31, 2018.[1] (*Id.* at Ex. No. 22.) Mr. Brettner failed to respond to this email as well. On July 27, 2018, Bridgeview again emailed Mr. Brettner the draft loan documents and asked him to schedule a closing on July 30 or July 31, 2018. (*Id.* at Ex. No. 23.) Once again, Mr. Brettner failed to respond to the email.

Hearing no response from Mr. Brettner, Bridgeview sent Mr. Ohlman the draft documentation for the Artesian Property Loan on July 26, 2018. (*Id.* at Ex. No. 24.) In its cover email, Bridgeview stated that the closing "will be scheduled by month end" at the offices of Di Silvestro & Associates. (*Id.*) Bridgeview also noted that the buyer would be responsible for payment of the second installment of 2017 taxes due on August 1, 2018. (*Id.*) On July 26, 2018, Mr. Ohlman responded, confirming receipt of Bridgeview's email. (*Id.* at Ex. No. 25.) He also

---

[1] Exhibit No. 22 mistakenly requests a closing date of August 30, 2018 or August 31, 2018. Bridgeview corrected its mistake on July 27, 2018 in an email with the subject "1508 Artesian-SORRY I meant to say either JULY 30, 2018 or JULY 31, 2018." (*Id.* at Ex. No. 23.)

stated that, by July 27, 2018, he would inform Bridgeview of his and his client's timeline for the loan documentation. (*Id.*) Yet Mr. Ohlman failed to provide the promised timeline and, after this email, neither Mr. Brettner nor Mr. Ohlman sent any more correspondence to Bridgeview or Mr. Rome about the Artesian Property Loan.

Despite the radio silence from Mr. Brettner and Mr. Ohlman, Bridgeview sent Mr. Ohlman several additional emails on July 26 and 27, 2018, asking him to confirm the accuracy of certain information in the loan documentation. (*Id.* at Group Ex. No. 26.) Bridgeview received no response. On July 27, 2018, Bridgeview's banker sent Mr. Ohlman yet another email, asking him to review a special warranty deed that Bridgeview had prepared for the closing and stating, "[t]he Bank is prepared to close, please advise me of the date(s)" Parkland II can appear at the closing. (*Id.* at Ex. No. 27.) Yet again, Bridgeview received no response.

Finally, on July 31, 2018, Mr. Rome sent a letter to Mr. Ohlman stating that Parkland II "failed to appear at the July 31, 2018 closing" and that "Bridgeview must move forward with running its business, and will no longer wait for your client to decide whether it wants to close on the Property." (*Id.* at Ex. No. 28.) Despite the dramatic action promised in this letter, Mr. Ohlman failed yet again to respond.

### Hearing Nothing From Mr. Ohlman or Mr. Brettner, Bridgeview Sells the Artesian Property

On September 27, 2018, after not having heard back from Mr. Ohlman, Mr. Brettner, or anyone else associated with Parkland II, 1508 N. Artesian/Chicago LLC, nominee of Bridgeview, sold the Artesian Property to NPA Properties LLC ("NPA") for $375,000.00. (Bridgeview Resp. p. 12.)

### Parkland II Finally Responds – Almost Two Weeks After the Sale

On October 8, 2018, Steven M. Rogers ("Mr. Rogers"), Parkland II's corporate attorney,

emailed Bridgeview and stated, among other things: "My client is informed that Bridgeview Bank

was the successful bidder in the Foreclosure Sale, and as such was expecting the bank to contact

him regarding financing Debtor's purchase of that property. That contact has not occurred, yet the

property appears to have been sold." (*Id.* at Ex. No. 29; Parkland II Mot. Ex. E.) On October 9,

2018, Mr. Rome refuted Mr. Rogers' false statement that Bridgeview had not contacted Parkland

II about financing by attaching a copy of Bridgeview's July 31, 2018 letter to Mr. Ohlman and

further stating:

> [Mr. Rogers],
>
> Please let us know who you represent and when you were retained. Pursuant to your
> request, please find one of the many documents that was sent to [Mr.] Ohlman in
> an attempt by Bridgeview Bank to sell this property to your client or an affiliate of
> your client. Please be further advised that Mr. Ohlman failed to respond in any way
> to the attached correspondence.
>
> [Mr. Rome]

(Bridgeview Resp. Ex. No. 30; Parkland II Mot. Ex. F.) On that same day, Mr. Rogers responded

to Mr. Rome that he "was retained this past Friday by [Parkland II] to look into this matter

following the Notice of Sale they received. I'll advise if there's anything else I need." (Bridgeview

Resp. Ex. No. 31.) Mr. Rogers never contacted Bridgeview or Mr. Rome again. In fact, no one

from Parkland II contacted Bridgeview about the Artesian Property until March 2019.

### Half a Year Later, Parkland II Filed this Motion

Six months after Bridgeview sold the Artesian Property to NPA, on March 28, 2019,

Parkland II filed this motion to enforce the Confirmation Order. In the motion, Parkland II seeks

imposition of remedial sanctions against Bridgeview under 11 U.S.C. § 105(a) including payment

of compensatory damages for the loss of the Artesian Property, as well as other losses it sustained,

and an award of attorney fees and expenses incurred in connection with this motion. Bridgeview

responded, and Parkland II submitted a reply brief. The parties informed the Court that there were

no material factual disputes and that they did not need an evidentiary hearing.

## IV.   DISCUSSION

Parkland II makes four arguments in support of its motion: (1) as the successful bidder at the foreclosure sale, Bridgeview knowingly violated the Confirmation Order by not financing Parkland II's reacquisition of the Artesian Property for $333,000.00 as required by § 3.07 of the Plan; (2) Bridgeview violated the Plan injunction and the Confirmation Order when it sold the Artesian Property to NPA for $375,000.00; (3) Bridgeview knowingly violated the discharge injunction under 11 U.S.C. § 524(a) and the Confirmation Order when it sold the Artesian Property to NPA and collected $375,000.00 of its allowed claim, which was discharged under 11 U.S.C. § 1141(d) as a personal liability of Parkland II; and (4) Bridgeview violated the discharge injunction when it obtained an *in rem* deficiency judgment in the amount of $293,121.78 against the Artesian Property, thereby creating a cloud on the title.

### A.   Bridgeview Did Not Violate the Plan or the Confirmation Order

"A confirmed chapter 11 plan of reorganization 'binds the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor[.]'" *In re Castle Home Builders, Inc.*, 520 B.R. 98, 106 (Bankr. N.D. Ill. 2014) (quoting 11 U.S.C. § 1141(a)). A confirmed plan amounts to a contract between the parties, and the plan describes their rights and obligations. *Ernst & Young LLP v. Baker O'Neal Holdings, Inc.*, 304 F.3d 753, 755 (7th Cir. 2002). Courts have the jurisdiction and power to enter an order construing or interpreting the terms and conditions of an order confirming a plan, if the plan is either ambiguous and unclear, or if the plan is inconsistent with the order confirming it. *In re Doty*, 129 B.R. 571, 588 (Bankr. N.D. Ind. 1991). Principles

of contract law apply to interpreting a plan of reorganization. *FCC v. Airadigm Commc'ns, Inc. (In re Airadigm Commc'ns, Inc.)*, 616 F.3d 642, 664 (7th Cir. 2010).

Section 13.04 of the Plan states in relevant part that "the laws of the State of Illinois govern the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise provided in the Plan." (Dkt. No. 506, § 13.04.) Thus, the Court will look to Illinois law in interpreting the Plan and Confirmation Order.

The primary objective of contract interpretation is to give effect to the intent of the parties. *Airadigm*, 616 F.3d at 664 (citing Illinois law). If only one interpretation of a contract is reasonable, it is unambiguous and the court can interpret its meaning as a matter of law. *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999). A contract is not ambiguous just because the parties disagree on its meaning. *Soarus L.L.C. v. Bolson Materials Int'l Corp.*, 905 F.3d 1009, 1011 (7th Cir. 2018) (citing Illinois law).

Bridgeview argues that the Plan does not require Parkland II to purchase the Artesian Property from Bridgeview. Instead, Bridgeview argues the Plan unambiguously only requires Bridgeview to provide limited *financing* of Parkland II's purchase of the Artesian Property if Parkland II confirms that it wishes to purchase the Property and follows through on that confirmation. Even then, the Plan unambiguously states that the financing will only be on terms and conditions acceptable *in Bridgeview's sole discretion*. Bridgeview points to the following language in § 3.07 of the Plan:

> In the event Bridgeview is the successful bidder in the Foreclosure Sale, Bridgeview shall finance Debtor's purchase of the Artesian Property from Bridgeview on terms and conditions acceptable to Bridgeview in its sole discretion (which will not include disbursement of funds to Debtor/borrower by Bridgeview) pursuant to the following terms:
>
> The principal amount of the loan on the Artesian Property shall be $333,000 (the "Artesian Property Loan"). Debtor shall pay Bridgeview $2,163.35 each month for

12

fifty-nine (59) months with a balloon payment of $302,048.84 due on the 60th month after the Effective Date.

(13 B 25121, Dkt. No. 49.)

Parkland II argues in response that § 3.07 implies the existence of additional Bridgeview obligations. Parkland II states that this section must be interpreted to mean that Bridgeview was not only obligated to finance Parkland II's purchase of the Artesian Property, but was also unconditionally obligated under the Plan and the Confirmation Order to sell the Artesian Property back to Parkland II for the sum of $333,000.00 without regard to whether Parkland II cooperated in making the sale possible. The problem with this response is that it conflicts with the plain and unambiguous language of § 3.07 of the Plan. Parkland II has not pointed to any ambiguity in the Plan that would enable the Court to interpret it as Parkland II wishes it to read, and the Court declines the invitation to depart from the plain language of the Plan.

The language in § 3.07 clearly states that Bridgeview will provide limited *financing* of Parkland II's purchase of the Artesian Property if Bridgeview acquires that Property at a foreclosure sale. It further provides that this financing by Bridgeview will be "on terms and conditions acceptable to Bridgeview *in its sole discretion*"—including the closing date. (*Id.*) (emphasis added). Nothing in the Plan states, ambiguously or otherwise, that Parkland II must purchase the Artesian Property from Bridgeview or that Bridgeview must sell the Artesian Property to Parkland II absent the cooperation from Parkland II necessary to make a sale possible.

Nor does any language in § 3.07 of the Plan specify a dollar amount for the sale price of the Artesian Property. Instead, that section unambiguously declares only that the maximum amount that Bridgeview must finance is $333,000.00.

In other words, the plain and unambiguous language of § 3.07 of the Plan does not obligate Parkland II to buy the Artesian Property, does not obligate Bridgeview to go to extreme lengths to

hold the Artesian Property available for sale to Parkland II indefinitely, and does not specify a purchase price for the Artesian Property. The Court will not bend the language of § 3.07 to create an ambiguity when none exists. *See Airadigm*, 616 F.3d at 664. Thus, the Court finds that Bridgeview did not violate the Plan or the Confirmation Order when it successfully bid on the Artesian Property and did not sell it to Parkland II.

   *i.*  ***Parkland II Waived its Right to Have Bridgeview Finance its Purchase of the Artesian Property***

   But even if the Court were to agree with Parkland II that § 3.07 of the Plan obligated Bridgeview to hold the Artesian Property for sale to Parkland II indefinitely at a purchase price of $333,000.00, the Court concludes that Parkland II waived those rights when it failed or refused to respond to Bridgeview's repeated requests to complete the purchase and finance process.

   Waiver is the voluntary and intentional relinquishment of a known right. *Anderson v. Holy See*, 878 F. Supp. 2d 923, 933 (N.D. Ill. 2012) (applying Illinois law), *aff'd sub nom.*, *Anderson v. Catholic Bishop of Chicago*, 759 F.3d 645 (7th Cir. 2014). Waiver "'arises from an affirmative act, is consensual, and consists of an intentional relinquishment of a known right.'" *Id.* (quoting *People v. Houston*, 890 N.E.2d 424, 429 n.3 (Ill. 2008)).

> If an express statement of waiver does not exist, the party who alleges implied waiver must point to 'a clear, unequivocal, and decisive act' which demonstrates the requisite intentional relinquishment of the right by the other party. If the parties do not dispute the material facts alleged in support of the waiver claim, and these facts support only one reasonable inference, the existence of waiver is a question of law. Where there is a dispute regarding the facts necessary to constitute waiver or 'if reasonable minds might differ as to inferences to be drawn from the undisputed evidence, then the issue becomes a question of fact.'

*Anderson*, 878 F. Supp. 2d at 933 (internal citations omitted).

   Bridgeview repeatedly tried to reach out to Parkland II through its counsel, Mr. Ohlman, and through one of its principals, Glenn Brettner, to try to sell the Artesian Property to Parkland II and to finance the purchase:

Beginning on June 25, 2018, Mr. Rome informed Mr. Ohlman about Bridgeview's intention to market the Artesian Property and asked him what Parkland II's intentions were about that Property. (Bridgeview Resp. Ex. No. 13.) Mr. Ohlman did not respond to this communication until July 9, 2018, when he stated that Parkland II would be entering into a modified mortgage for the Artesian Property. (*Id.* at Ex. No. 14)

Mr. Rome then asked Mr. Ohlman on July 11, 2018 for the name of the entity that would take title to the Artesian Property and also asked when an inspection of the Property could be scheduled. (*Id.* at Ex. No. 15.) Mr. Ohlman responded the next day that he would verify the entity taking title and said that he wanted to schedule an inspection for the next week. (*Id.* at Ex. No. 16.) On July 17, 2018, Mr. Ohlman provided Mr. Rome with the name of the entity that would be taking title to the Artesian Property. (*Id.* at Ex. No. 17.) On July 19, 2018, Mr. Rome asked Mr. Ohlman for the tax identification number and organizational documents for the entity taking title to the Artesian Property. (*Id.* at Ex. No. 18.) Mr. Ohlman never responded to this request.

On July 23, 2018, Glenn Brettner emailed one of the Bridgeview bankers and stated that he would be signing the papers and would set up an inspection of the Artesian Property. (*Id.* at Ex. No. 19.) That same day, the Bridgeview banker thanked Mr. Brettner and stated that he hoped the deal would close that week. (*Id.* at Ex. No. 20.)

On July 25, 2018, Bridgeview reached out to Mr. Brettner and asked about his availability to sign the loan documents on July 30 or 31, 2018. (*Id.* at Ex. No. 21.) Mr. Brettner never again communicated with anyone at Bridgeview. On July 26, 2018, Bridgeview again reached out to Mr. Brettner, attached the draft loan documents, and asked about scheduling the closing for July 30 or 31, 2018. (*Id.* at Ex. No. 22.) Mr. Brettner failed to respond. The next day, on July 27,

2018, Bridgeview again emailed the draft loan documents to Mr. Brettner and asked about the closing date. (*Id.* at Ex. No. 23.) Again, no response from Mr. Brettner.

On July 26, 2018, Bridgeview sent the draft loan documents to Mr. Ohlman for his review and once again requested the organizational documents for the entity taking title to the Artesian Property. (*Id.* at Ex. No. 24.) Bridgeview also informed Mr. Ohlman of the place where the closing would be held. (*Id.*) Mr. Ohlman responded on that same date and stated that he needed an opportunity to review the documents with his client. (*Id.* at Ex. No. 25.) He stated that he would provide a timeline the next day for completing the transaction. (*Id.*) But this proved to be Mr. Ohlman's last communication with Bridgeview about the Artesian Property Loan and Mr. Ohlman never provided Bridgeview with the loan-documentation timeline he had promised.

Bridgeview then sent an additional email to Mr. Ohlman on July 26, 2018, asking him to confirm the accuracy of certain information in the loan documents. (*Id.* at Ex. No. 26.) No response. Bridgeview then sent yet another email to Mr. Ohlman on July 27, 2018, asking him to review a warranty deed that Bridgeview had prepared and advise of the date that Parkland II could appear at the closing. (*Id.* at Ex. No. 27.) No response.

The record is clear: Despite first showing an interest in purchasing the Artesian Property and providing a tax identification number for the purported purchaser of the property, neither Mr. Ohlman nor Mr. Brettner (nor anyone else from Parkland II) ever took any steps which would have been necessary to make such a purchase possible. By contrast, Bridgeview took all the actions reasonably available to it, with no cooperation from Mr. Ohlman and Mr. Brettner, to make a sale possible. But a sale requires both a willing seller and a willing buyer. Here, the purported buyer repeatedly failed to participate or even respond in any meaningful way to Bridgeview's many requests for the minimum amount of information, documentation, and input that would have been

necessary to make a sale possible.

Based on these undisputed facts, the Court finds that Bridgeview took all the steps reasonably available to it to fulfill its contractual obligation to finance the sale of the Artesian Property to Parkland II. Bridgeview drafted loan documents and delivered those documents to both Mr. Brettner and Mr. Ohlman. Not only did Bridgeview offer to finance the sale of the Artesian Property to Parkland II, it drafted the necessary loan documents, delivered those documents, and scheduled a closing date for July 31, 2018.

Finally, however, Bridgeview had had enough, and informed Mr. Ohlman on July 31, 2018 that it had given up on trying to sell the Artesian Property to Parkland II and would be selling the property to a third party. (*Id.* at Ex. No. 28.) Parkland II did not respond to this presumably alarming notice until October 8, 2018, two months after the July 31st notice from Bridgeview, and two weeks after the sale to a third party had taken place.

Even then, the response consisted only of an email from Parkland II's corporate attorney, Mr. Rogers, falsely claiming that Bridgeview had failed to contact Parkland II to arrange the sale and financing of the Artesian Property to Parkland II. (*Id.* at Ex. No. 29; Parkland Mot. Ex. E.) When Bridgeview promptly produced documentary evidence that it had repeatedly contacted Parkland II to try to arrange just such financing (Bridgeview Resp. Ex. No. 30; Parkland II Mot. Ex. F), Mr. Rogers quickly backtracked (Bridgeview Resp. Ex. No. 31) and was never heard from again. From that day until almost six months later, when Parkland II filed the instant motion on March 28, 2019, no one from Parkland II ever complained to Bridgeview about the sale of the Artesian Property. It is the Court's opinion that Parkland II's long and many silences when a reasonable person would have spoken out amount to a waiver of Parkland II's rights under § 3.07 of the Plan.

A party to a contract may waive, by its conduct, its legal right to strict performance of the terms of a contract. *Lake County Grading Co. of Libertyville, Inc. v. Advance Mechanical Contractors, Inc.*, 654 N.E.2d 1109, 1118 (Ill. App. Ct. 1995). The Plan was a binding contract that gave Parkland II certain rights, including Bridgeview financing the purchase of the Artesian Property. Based on the silence and inaction of Mr. Brettner and Mr. Ohlman, the Court finds that Parkland II rejected the "terms and conditions [of the Artesian Property Loan] acceptable to Bridgeview in its sole discretion[.]" (13 B 25121, Dkt. No. 49.)

As a result, Parkland II waived its right to have Bridgeview finance Parkland II's purchase of the Artesian Property.[2]

### ii.    *Bridgeview Did Not Violate its Duty of Good Faith and Fair Dealing*

Parkland II argues that, even if Bridgeview had broad discretion under § 3.07 of the Plan, that discretion was bounded by its implied duty of good faith and fair dealing. Parkland II argues that Bridgeview breached its implied duty when it: (1) unilaterally scheduled a closing date on July 31, 2018 without giving Parkland II or Mr. Ohlman any notice of the date or time of the closing; (2) preemptively and without notice, set July 31, 2018 as the "drop dead date" for the closing; (3) declared Parkland II's failure to appear at the July 31, 2018 closing a breach of the lift stay order; (4) refused to continue or reschedule the closing; and (5) threatened Parkland II with retaliatory legal action if it took any action to assert or protect is rights in the Artesian Property.

---

[2] Bridgeview also argues that the doctrine of laches bars Parkland II's motion for contempt because Parkland II unreasonably delayed pursuing its desire to purchase the Artesian Property. Laches is an equitable doctrine that bars an action where an unreasonable delay in bringing suit causes prejudice to the opposing party, who has taken a course of action different from what it otherwise would have taken. *People v. Hawkins*, 690 N.E.2d 999, 1005 (Ill. 1998). "It is the equitable counterpart to defenses based on the statute of limitations; statutes of limitations generally apply to actions at law, while the doctrine of laches applies to actions in equity." *Gen. Auto Serv. Station, LLC v. Garrett*, 50 N.E.3d 1144, 1147 (Ill. App. Ct. 2016). "No court has applied laches to a breach of contract action between private parties where the relief sought was limited to money damages. Indeed, the Seventh Circuit, applying Illinois law, expressly declined to do so." *Id.* at 1148 (citing *Nature Conservancy v. Wilder Corp. of Del.*, 656 F.3d 646, 650 (7th Cir. 2011)). The Court finds that Parkland II's conduct does not support a laches defense by Bridgeview because this motion is a claim for money damages, not an action in equity. Thus, Bridgeview's laches defense fails.

(Parkland II Reply p. 14.)

The duty of good faith and fair dealing is "implied in every contract and requires a party vested with contractual discretion to exercise it reasonably, and not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of parties." *RBS Citizens, Nat'l Ass'n v. RTG-Oak Lawn, LLC*, 943 N.E.2d 198, 207 (Ill. App. Ct. 2011). "Its purpose is to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract." *Id.*

The Court concludes that Bridgeview did not violate its duty of good faith and fair dealing. The burden is upon Parkland II to establish such a violation, yet Parkland II submitted no evidence in support of its argument that Bridgeview violated its duty of good faith and fair dealing when it scheduled the closing date of the Artesian Property for July 31, 2018. To the contrary, the evidence is clear that neither Mr. Brettner nor Mr. Ohlman even bothered to ask Bridgeview to continue or reschedule that date to a different date. Given the promptness and frequency of Bridgeview's communications to Mr. Ohlman, Mr. Brettner, and Mr. Rogers, and the near total lack of meaningful communication in return, if there were any lack of good faith and fair dealing by any party, it would appear to be on Parkland II's part, not Bridgeview's. Parkland II's assertion that Bridgeview violated its duty of good faith and fair dealing lacks merit.

### iii.    *The Notice Provisions of §§ 7.03 and 7.04 Did Not Apply Because Parkland II Was Never in Material Default Under the Plan*

Parkland II next argues that Bridgeview violated the Plan, Confirmation Order, and § 524 by selling the Artesian Property to NPA when Parkland II was never in material default under the Plan. Parkland II also argues that Bridgeview ignored the notice provisions in the Plan before declaring Parkland II in default and selling the Artesian Property to a third-party. The relevant

sections of the Plan, §§ 7.03 and 7.04, provide as follows:

> Creditor Action Restrained.  Creditors may not take any action to enforce either
> pre-confirmation obligations or obligations due under the Plan, so long as the
> Debtor is not in Material Default (defined below in Section 7.04) under the Plan.
> If the Debtor is in Material Default under the Plan, then affected creditors may take
> any actions permitted under non-bankruptcy law to enforce the terms of the Plan or
> move to dismiss this case or to convert this case to a Chapter 7 bankruptcy case.

> Material Default Defined.  If the Debtor fails to make any payment required under
> the Plan, or to perform any other obligation required under the Plan, the affected
> creditor may serve upon the Debtor and Debtor's attorney (if any) a written notice
> of default.  The Debtor is in Material Default under the Plan if the Debtor fails,
> within 21 days of the service of such notice of default, to either (i) cure the default
> or (ii) to obtain from the Court an extension of time to cure the default or a
> determination that no default occurred.

(Dkt. No. 506, §§ 7.03 & 7.04.)

These provisions are limited to situations in which Parkland II has committed a material

default under the Plan.  The Court finds that Parkland II was not in material default under the Plan

and Bridgeview never declared Parkland II to be in material default.  Thus, Bridgeview did not

have to provide Parkland II and its attorney with a written notice of default under these sections of

the Plan.

As the Court stated, Parkland II was never obligated under the Plan to purchase the Artesian

Property from Bridgeview.  Because Parkland II did not have to purchase the Artesian Property,

Bridgeview did not argue, nor could it, that Parkland II was in material default under the Plan, i.e.

that it failed "to make any payment required under the Plan," or that it failed "to perform any other

obligation required under the Plan."  As a result, Bridgeview did not have to provide Parkland II

and its attorney written notice of default under §§ 7.03 and 7.04 of the Plan before it sold the

Artesian Property to NPA.

Parkland II contends that it first learned of Bridgeview's sale of the Artesian Property to

NPA on October 1, 2018, when Mr. Brettner obtained a copy of a "Notice to Tenants" that NPA

had posted at the Property which notified the tenants that NPA was the new owner of the Artesian
Property and directed the tenants to send the October rental payments to NPA. (Parkland II Mot.
p. 6, Ex. D.) But Parkland II must be presumed to have been aware by at least July 26, 2018 that
Bridgeview was going forward with a sale and closing to *someone* other than Parkland II on July
31, 2018. Parkland II never explains why the precise identity of the purchaser is relevant to any
issue raised by its motion. But even if that buyer's identity were relevant, Parkland II's failure to
learn of it earlier is entirely due to its own representatives' failure to respond to Bridgeview's
emails.

In short, the Court finds that Bridgeview did not have to comply with the notice provisions
of §§ 7.03 and 7.04 of the Plan and therefore it did not violate the Plan or the Confirmation Order.

**B.      Bridgeview Did Not Violate the Discharge Injunction**

A bankruptcy court may hold a creditor in contempt for violating the discharge injunction.
*See, e.g., In re Taylor*, 793 F.3d 814, 817 (7th Cir. 2015). The United States Supreme Court has
stated that the proper standard for civil contempt is an objective one. *Taggart v. Lorenzen*, 139
S.Ct. 1795, 1804 (2019). "A court may hold a creditor in civil contempt for violating a discharge
order where there is not a 'fair ground of doubt' as to whether the creditor's conduct might be
lawful under the discharge order." *Id.*

A confirmed Chapter 11 reorganization plan "discharges the debtor from any debt that
arose before the date of such confirmation[.]"  11 U.S.C. § 1141 (d)(1)(A). The effect of a
discharge in a bankruptcy case "operates as an injunction against the commencement or
continuation of an action, the employment of process, or an act, to collect, recover or offset any
[discharged] debt as a personal liability of the debtor, whether or not discharge such debt is
waived[.]" 11 U.S.C. § 524(a)(2).

A court may "'sanction a party for violating the discharge injunction only if the party took some action prohibited by § 524(a)(2)—i.e., an action to collect, recover or offset any [discharged] debt . . . of the debtor.'" *Taylor*, 793 F.3d at 819-20 (quoting *Paul v. Iglehart (In re Paul)*, 534 F.3d 1303, 1307 (10th Cir. 2008) (internal quotation omitted)). To prove a violation of the discharge injunction, a debtor must prove that (1) the creditor was seeking to collect a debt that was in fact discharged, and (2) the creditor's action in doing so was willful. *In re Weinhold*, 393 B.R. 623, 628-29 (Bankr. E.D. Wis. 2008). These elements must be established by clear and convincing evidence. *Id.* at 628; *In re Barr*, 457 B.R. 733, 735 (Bankr. N.D. Ill. 2011).

The Court rejects Parkland II's argument that Bridgeview violated the discharge injunction and § 7.03 of the Plan. On September 15, 2015, the Court lifted the automatic stay in favor of Bridgeview to allow it to enforce its rights in the State Court with respect to the Artesian Property. (Dkt. No. 529.) Specifically, that order stated that Bridgeview could "exercise its rights and remedies under applicable law, including without limitation, foreclose its lien on, to, and against . . . the Artesian Property[.]" (*Id.* at p. 5.) Bridgeview won the bid at the foreclosure sale and later sold the Artesian Property to NPA. Bridgeview's sale of the Artesian Property to NPA did not violate § 7.03 of the Plan because Bridgeview was not "enforc[ing] either pre-confirmation obligations or obligations due under the Plan." Bridgeview owned the Artesian Property then. Neither did Bridgeview violate the discharge injunction under § 524 by trying to collect or recover or offset any debt as a personal liability of Parkland II by selling that Property to NPA. Bridgeview sold an asset that it owned and the sale did not affect Parkland II's debts.

Nor did Bridgeview violate the discharge injunction when it obtained the *in rem* deficiency judgment. "The discharge injunction prohibits a creditor from enforcing a discharged claim against a debtor *in personam*, but the discharge injunction does not prohibit the creditor from

enforcing an *in rem* claim against the debtor's property." *Rountree v. Nunnery (In re Rountree)*, 448 B.R. 389, 401 (Bankr. E.D. Va. 2011). The Supreme Court has made clear that "a bankruptcy discharge extinguishes only one mode of enforcing a claim—an *in personam* action—while leaving intact another—an *in rem* action." *Johnson v. Home State Bank*, 501 U.S. 78, 79 (1991). Thus, *in rem* claims survive the discharge while *in personam* claims are extinguished by the discharge.

When Bridgeview obtained the *in rem* deficiency judgment, the Court had lifted the stay in its favor to allow it to exercise its rights and remedies under Illinois law with respect to the Artesian Property. Thus, the Artesian Property was no longer property of the estate. *See In re Griggs*, 82 B.R. 532, 533 (Bankr. W.D. Mo. 1988) (stating that if the stay has been lifted on certain property, that property is no longer property of the estate).

Bridgeview thus did not violate § 7.03 of the Plan because it was not taking "any action to enforce either pre-confirmation obligations or obligations under the Plan." And the Court finds that Bridgeview did not violate the discharge injunction.[3]

---

[3] For the first time in its reply brief, Parkland II raises the argument that Bridgeview violated the discharge injunction by obtaining a double recovery on its claim. (Parkland II Reply pp. 19-23.) According to Parkland II, Bridgeview failed to amend or vacate the foreclosure judgment to credit properly the $52,067.64 payment that Parkland II made to Bridgeview under the Plan for Bridgeview's Class V claim. As a result, Parkland II argues that Bridgeview realized a double recovery of its judgment obtained on May 10, 2013 in the amount of $44,466.27 against Parkland II and the Brettners by foreclosing on the judgment lien and using the $409,000.00 proceeds to fund its credit bid to purchase the Artesian Property at the foreclosure sale. Arguments raised for the first time in a reply brief are waived. *Mendez v. Perla Dental*, 646 F.3d 420, 423-24 (7th Cir. 2011). Thus, the Court declines to address this argument.

## V.     CONCLUSION

For all these reasons, the Court denies Parkland II's motion to enforce the Confirmation

Order.


**ENTERED:**


DATE: ___JUL 1 6 2019___          _____
                                    **Donald R. Cassling**
                                    **United States Bankruptcy Judge**